DAVID DONNENBERG, LOUIS MARRICHI, CHARLES
COPPOLINO, JACOB SHAPOS AND JACOB
KRAMER *v.* STATE OF MARYLAND

[No. 273, Initial Term, 1967.]

594 

 

*Decided August 3, 1967.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ., and PRETTYMAN, J., Associate Judge of the First Judicial Circuit, specially assigned.

*Marshall A. Levin,* with whom was *Gordon H. Levy* on the brief, for appellants.

*David T. Mason, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *John H. Lewin, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellants were convicted by the Criminal Court of Baltimore of violating Maryland Code, Art. 27, § 418(a) which makes it a misdemeanor for any person to "knowingly * * * sell, * * * give away, or show or have in his or her possession

with intent to sell or give away, or to exhibit [or] show * * * any lewd, obscene or indecent * * * magazine * * * or photograph * * *." Art. 27, § 418(b) establishes a rebuttable presumption that any person found violating the statute in any bookstore or mercantile establishment and found to be an employee of the person actively engaged in the operation of such an establishment, was doing so within the scope of his employment, within the course of the employer's business and with the knowledge of the employer. The subject matter of the prosecutions was four magazines, more accurately described as picture books or bound photographs. The publications, *I.N.S. International Nudist Sun #3* and *Percy No. 1,* were introduced as evidence against Jacob Kramer, the proprietor of Book Nook, Incorporated which had two locations, one at 216 E. Baltimore Street and one at 406 E. Baltimore Street; *I.N.S. International Nudist Sun #3* against David Donnenberg, the employee of Kramer at the 216 E. Baltimore Street store; *Percy No. 1* against Jacob Shapos, the employee of Kramer at the 406 E. Baltimore Street store; *I.N.S. International Nudist Sun #2* and *Degraded in Bondage* against Louis Marrichi, the proprietor of Cut Price Book Company located at 645 N. Howard Street and against Charles Coppolino, his employee. At the close of the evidence offered by the State, the appellants made motions for judgment of acquittal on each count of each indictment against them. The motions were denied and no evidence was proffered by the appellants.

The contentions of the appellants on this appeal are in substance as follows:

1. The evidence was not sufficient to sustain the convictions in that:
 a) it did not prove the appellants "knew the contents of the material or believed that the material violated the law"
 b) it did not prove the publications were obscene
2. The trial court erred in permitting two witnesses for the State to testify as expert witnesses.

With the exception of the magazine obtained from Donnenberg, the publications were purchased by Lieutenant William Roch-

ford, a member of the Criminal Investigation Vice Section of the Baltimore City Police Department. He purchased *Degraded in Bondage* at a price of $5 and *I.N.S. #2* at a price of $3 from Coppolino and *Percy No. 1* from Shapos at a price of $5. In the store at 216 E. Baltimore Street the officer took *I.N.S. #3* off the rack and was about to remove the plastic wrapper with which it was covered, when Donnenberg came from behind the counter and said he could not open it, he would have to pay for it first. The officer identified himself and said he was making an inspection and Donnenberg "became very excitable and said that he was closing down, he wasn't selling anything." The officer offered to purchase the magazine but Donnenberg said "he was sick, he had just gotten out of the hospital before that, and he was selling out or going out of business and he was closing the store." He would not give the officer any information, so the officer "just took the book out and he locked the door." Objection was made to the admission in evidence of the magazine on the ground that it was taken by force and the court reserved its ruling. The record does not disclose a ruling was made, but the magazine was admitted in evidence. Donnenberg is charged under a one count indictment that he "unlawfully did sell and give away to William F. Rochford, a certain lewd, obscene and indecent magazine of certain female and male persons whose names are to the Jurors aforesaid unknown, to wit: I.N.S. International Nudist Sun #2, American Edition." Although Donnenberg does not specifically raise the point on appeal, we find no legally sufficient evidence in the record that he sold or gave away the magazine. By the testimony of the officer he "just took the book out" after Donnenberg refused to sell it. While it may be that Donnenberg would have sold the magazine had he not known the purchaser was a police officer, he is only charged with selling it and giving it away and the evidence is clear that he did not do either. For this reason, and without regard to the other contentions raised, we find that the trial court erred in not granting the motion for judgment of acquittal made on behalf of Donnenberg. We note also that the magazine is described in the indictment as *"I.N.S. International Nudist Sun #2, American Edition"* but that the publication introduced in evidence against him was *I.N.S. In-*

*ternational Nudist Sun #3, American Edition.* In view of our ruling, however, we do not consider this.

The basic question raised on this appeal is whether the publications introduced in evidence were obscene and we shall now consider it.[1] Although the statute uses the words "lewd, obscene or indecent," the trial court and this Court are bound by the definition of obscenity as enunciated by the Supreme Court of the United States.

> "States are free to adopt other definitions of obscenity only to the extent that those adopted stay within the bounds set by the constitutional criteria of the *Roth* definition, which restrict the regulation of the publication and sale of books to that traditionally and universally tolerated in our society." *Mishkin v. New York,* 383 U. S. 502, 507-508.

Thus, while in common usage the words have different shades of meaning, we cannot distinguish "lewd" and "indecent" from "obscene" in our consideration of the statute and we take it that the Maryland Legislature intended by its use of these three words what the word "obscene" means in prevailing leading legal thought. Otherwise the words would be too vague to constitute a permissible standard in a criminal statute. *Levin v. State,* 1 Md. App. 139, 143. *Roth v. United States* and *Alberts v. California,* 354 U. S. 476, holding that obscenity is not within the area of constitutionally protected speech or press, rejected the early leading standard of obscenity—judging obscenity by the effect of isolated passages upon the most susceptible persons—set forth in *Regina v. Hicklin,* [1868] L.R.3 Q.B.360. We understand the *Roth-Alberts* definition of obscenity —

---

1. The State urges that although the appellants raised the issue of the sufficiency *vel non* of the evidence to prove the magazines were obscene, as one of the questions presented, they did not argue the point in their brief and therefore the question is not properly before this Court. Maryland Rule, 1031. We feel that the matter is inherent in the argument made and that the contents of the appellant's brief place the matter before us within the intent of the rule. We suggest, however, that it would have been desirable for the appellants to consider the specific question more fully.

"whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest"—as reiterated in *Jacobellis v. Ohio,* 378 U. S. 184, elaborated in *Ginzburg v. United States,* 383 U. S. 463, adjusted in *Mishkin v. New York,* 383 U. S. 502 and summarized in *A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General,* (the *Fanny Hill* decision) 383 U. S. 413 establishes the following test for obscenity:

Three elements must coalesce; it must be established that:

1) The dominant theme of the material taken as a whole appeals to a prurient interest in sex.
 a) where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group.
2) The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters.
3) The material is utterly without redeeming social value.
 Each of the above three federal constitutional criteria must be applied independently and neither be weighed against nor canceled by any of the others.
 a) As an aid to determining the question of obscenity, the setting in which the material was presented may be considered. Thus evidence of pandering—"the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest—is relevant" and "where a purveyor's sole emphasis is on the sexually provocative aspects of his publications, a court could accept his evaluation on its face value."

The Supreme Court of the United States has not determined whether the "community" involved in applying "contemporary community standards" is local or national or some other geo-

graphical designation. In *Jacobellis v. Ohio, supra,* there was a division of opinion, three justices indicating that it should be a local community, two justices indicating that it should be a national community and four justices remaining silent on the issue. The question has not been resolved by subequent decisions of that Court. Nor has the Court of Appeals of this State needed to resolve this "thorny issue." *Trans-Lux v. Md. Censor Board,* 240 Md. 98, 105; *Hewitt v. Bd. of Censors,* 243 Md. 574, 594, note 8; *Sanza v. Md. Board of Censors,* 245 Md. 319, 332.

The general rule with respect to cases tried by the court sitting without a jury is that this Court has the right to review them on both the law and the evidence to determine whether in law the evidence was sufficient to sustain the conviction, though we may not set aside the verdict on the evidence unless it is clearly erroneous. Maryland Rule, 1086; *Levin v. State, supra.* However, in *Jacobellis v. Ohio, supra,* the Court rejected the suggestion that the determination whether a book or other work of expression "is obscene can be treated as a purely factual judgment on which a jury's verdict is all but conclusive, or that in any event the decision can be left essentially to state and lower federal courts, with (the Supreme) Court exercising only a limited review such as that needed to determine whether the ruling below is supported by 'sufficient evidence.' " It said, page 190:

> "Hence we reaffirm the principle that in 'obscenity' cases as in all others involving rights derived from the First Amendment guarantees of free expression, this Court cannot avoid making an independent constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected."

The Court of Appeals of this State and this Court have recognized the obligation to make an independent constitutional judgment on the facts of such cases. *Sanza v. Md. Board of Censors, supra; Levin v. State, supra.* But we are also mindful that "we are judges, not literary experts or historians or philosophers," *Fanny Hill, supra,* concurring opinion of Mr. Justice Douglas, at 383 U. S. 427, and that neither the judge trying the case

in the lower court nor the judges of this Court would be qualified to determine whether material meets the requirements of the test of *Roth-Alberts* without enlightening testimony. See *Sanza v. Md. Board of Censors, supra,* page 330. There is an exception with respect to material that is hard-core pornography. We noted in *Levin v. State, supra,* that hard-core pornography has been said to be material which "focuses predominately upon what is sexually morbid, grossly perverse, and bizarre without any artistic merit or scientific purpose or justification." There is no desire to portray the material in pseudo-scientific or "arty" terms. It can be recognized by the insult it offers, invariably, to sex and to the human spirit. It goes substantially beyond customary limits of candor and deviates from society's standards of decency in the representation of the matters in which it deals. It has a patent absence of any redeeming social value; it speaks for itself and screams for all to hear that it is obscene. It is not designed to be a truthful description of the basic realities of life as the individual experiences them but its main purpose is to stimulate erotic response. *Hewitt v. Bd. of Censors, supra.* No proof, other than the viewing of it, is required to determine if it is, in fact, obscene. But as to other than hard-core pornography, we feel that there must be evidence other than the material itself. In *Hewitt v. Bd. of Censors, supra,* the single, narrow issue of whether an order of a trial judge disapproving the licensing of a film pursuant to the provisions of Code (1957), Art. 66A, § 19 can be supported without expert testimony was presented to the Court. The Court found that the average person is not qualified to give expert testimony in the area of obscenity and that such testimony, standing alone, could not support an order disapproving a film for licensing because it is said to be obscene. It held that expert testimony was required. Material which is in fact obscene under the *Roth-Alberts* test may be proscribed in many ways— for example, by refusing to issue a license to exhibit it, by confiscating it, or by prosecution of those who disseminate it — provided, of course, that the proscription is imposed in accordance with constitutional standards. Certainly no less rigid requirements of proof of obscenity are permissible in criminal prosecutions than in civil proceedings and, for the reasons so

fully set forth in *Hewitt,* we hold that expert testimony is required to prove the elements of the *Roth-Alberts* test in criminal prosecutions of obscenity cases (excluding, necessarily, hardcore pornography).

We now turn to the material which is the subject of the prosecutions in the instant case. The trial court found *Degraded in Bondage* to be obscene per se, by which we take to mean hardcore pornography. It contains some sixty photographs of women, scantily clad, and whose breasts, in most of the photographs, are fully exposed. The women are bound by straps or ropes in tortuous poses, in some photographs alone, in others in pairs, their limbs and bodies intertwined in various ways. In some, one woman is obviously inflicting pain on the bound woman. The pubic area is not fully exposed but in some instances is highlighted by the pose. In other photographs the anal area is highlighted. There is no text, but the magazine contains advertisements of similar publications. We have made an independent reflective appraisal of this magazine and agree with the trial court that it is hard-core pornography. Even assuming that to be hard-core pornography there must be illustrated incidents of sexual activity, normal or perverted, involving some "act", we feel that the photographs in *Degraded in Bondage* depict a sufficient "act" to be flagrant erotica and that the publication, taken as a whole, not only speaks for itself but screams for all to hear that it is obscene. No other proof of its obscenity is required.

The trial court found *Percy No. 1* to be obscene per se. *Percy No. 1* consists of some 35 photographs of young men in an outdoor setting. They are standing, sitting or reclining, full face or in profile to the camera. The poses are not unlike those apt to be taken by any amateur photographer at the beach or at a woodland swimming hole, but the subjects are completely nude. There are five and one-half pages of text entitled "Clean or Obscene?" which concludes that what is obscene to one person may not be to another and on the way to this conclusion mentions, in pseudo-intellectual manner, the paintings of Goya and Turner, the poetry of Sappho, and the novel, *Candy,* compared to the comic strip "Peanuts." The text has no relation to the photographs except to suggest that some persons may

consider the photographs obscene and cannot be said to import redeeming social value to the publication. Mere nudity, in and of itself, is not obscene nor are sex and obscenity synonymous. *Sanza v. Md. Board of Censors, supra; Monfred v. State,* 226 Md. 312. We do not agree that *Percy No. 1* is hard-core pornography. We do not think that it "focuses predominantly upon what is sexually morbid, grossly perverse and bizarre." The genitalia are fully exposed, but none of the men have an erection or a partial erection and sexual activity is not suggested or depicted, although in some photographs more than one man appears. The pubic area is not high-lighted except by the fact the men are naked. We cannot say that it screams for all to hear that it is obscene, and to find it so, the test of *Roth-Alberts* must be met.

*I.N.S. International Nudist Sun #2* and *I.N.S. International Nudist #3* are similar in nature. Each contains some sixty photographs of naked women, men and children of all ages, sizes and shapes, some appearing to be family groups. The trial court found forty-nine photographs in I.N.S. #2 and forty-two photographs in I.N.S. #3 to be not obscene and we agree. It found the remaining photographs to be obscene per se and as we understand its reasoning, it felt that they set the tone for the remaining photographs and cause the publication as a whole to be obscene. There is an insignificant amount of text in each magazine, extolling the virtures of the nudist concept, and while the text is not obscene, it is unrelated and subsidiary to the photographs and lends no redeeming social value to the publications. It is clear that the photographs are the reason for and purpose of the publication. We cannot agree that any of the photographs are hard-core pornography. While in most of the photographs the genitalia of the subjects are fully exposed, as are the breasts of the females, and while in some, the female subject is posed in a reclining position, which we assume to be those referred to by the trial court as "lying prone in an enticing and provocative pose," [2] we do not think that they speak for themselves that they are obscene. Nor do we find

2. We do not know with certainty which photographs the trial court found to be obscene per se as the pages of the publications are not numbered so as to make specific reference possible.

that any of the photographs of men scream for all to hear that they are obscene. None have a full or partial erection and in none is a sexual act, normal or perverted, depicted. As in the publication *Percy No. 1* we think that there must be sufficient evidence that the requirements of the *Roth-Alberts* test have been met to find these two publications obscene.

The trial court recognized that there was "no direct evidence in the case that all the significant elements of the *Roth-Alberts* test have been met." It felt, however, that those elements upon which there was no direct testimony were fulfilled by application of the principles announced in *Ginzburg v. United States, supra.* We do not find from the record sufficient evidence that "the purveyor's sole emphasis is on the sexually provocative aspects of his publications," or of "the deliberate representation" by the appellants of the publications "as erotically arousing" so that the buyers of them were "stimulated * * * to accept them as prurient." The fact, if shown, that the publications "originate or are used as a subject of pandering is relevant to the application of the *Roth* test" and not a substitute for it, although the fact, if proved, that the publications were "created or exploited entirely on the basis of [their] appeal to prurient interests strengthens the conclusion that the transactions * * * were sales of illicit merchandise, not sales of constitutionally protected matter." But in any event, we agree with the trial court that the evidence does not establish the three elements of the *Roth-Alberts* test with regard to the publications *Percy No. 1, I.N.S. International Nudist Sun ‡2* and *I.N.S. International Nudist Sun ‡3,* and hold that the judgments based on these publications must be reversed. As the State may be able to produce the necessary evidence by the testimony of witnesses qualified as experts under the principles enunciated in *Hewitt v. Bd. of Censors, supra,* and other proper evidence, we shall remand those cases for a new trial. In doing so, we are aware that it may be necessary for the lower court to determine what the Supreme Court meant by "community standards" for as heretofore pointed out it is divided in the meaning of the phrase and the question has not been resolved by the Court of Appeals or this Court. We think it inadvisable for us to attempt to determine the matter at this time in the absence of full argu-

ment, orally and by brief, and citation of authorities on the point by the State and the appellants. The lower court may have the advantage of such argument on retrial if it deems it necessary and may find it expedient to have produced before it testimony of qualified persons or other evidence relevant to the question—for example whether there exists an ascertainable contemporary national community standard relating to the description or representation of sexual matters and whether there is such a local or State standard ascertainable. We shall then deal with the question when it is squarely before us.

With regard to the contention of the appellants that the evidence was insufficient to prove "they knew the contents of the material or believe that the material violated the law," we are concerned only with the judgments based on the publication *Degraded in Bondage* in view of our holdings as to the judgments based on the other publications. The evidence showed that *Degraded in Bondage* was sold by Coppolino in a store, the license in which to do business was in the name of Marrichi and that Coppolino was employed by Marrichi. The presumption established by *Code*, Art. 27, § 418(b) that the obscene magazine was sold within the scope of Coppolino's employment, within the course of Marrichi's business and with the knowledge of Marrichi was not rebutted. We find no merit in the contention that the evidence did not show *scienter* and *mens rea*. We said in *Levin v. State, supra,* page 146:

> "[T]he term 'obscene' is 'not susceptible of definition, anymore than is the loftier concept of due process of law, but it is an inherent part of our system of constitutional government that broad concepts take on definite meaning only as the ground covered by the concept is marked out case by case.' It is true that the term 'obscene' is not precise, but lack of precision is not of itself offensive to the requirements of due process. The Constitution does not require impossible standards. All that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."

We found that the term "obscene" applied according to prevailing leading legal thought "gives adequate warning of the conduct proscribed and marks boundaries sufficiently distinct for judges and juries fairly to administer the law." We have held that the publication, *Degraded in Bondage,* was hard-core pornography, screaming for all to hear that it was obscene. Coppolino and Marrichi cannot maintain that they did not hear the scream.

In view of our holdings, the second contention of the appellants need not be considered.

> *Judgment as to Donnenberg, indictment No. 2371, reversed.*
>
> *Judgments as to Marrichi, indictment No. 2599, affirmed.*
>
> *Judgment as to Coppolino, indictment No. 2603, affirmed.*
>
> *Judgments as to Kramer, indictments Nos. 2609 and 2610, Coppolino, indictment No. 2604, Shapos, indictment No. 2607, Marrichi, indictment No. 2600, reversed and cases remanded for a new trial.*
>
> *Marrichi and Coppolino each to pay one-eighth of the costs.*